Please be seated. This is the United States of America v. Reginald Graham and other appellants and let's see we've got Harold Hagel is here for Appellant Glass, Ken Schwartz is here for Appellant Walker, Bruce Fleischer is here for Appellant C. Bryant and present for questions but not arguing we've got let's see for Villanueva, Rodriguez, Mr. Encinosa is here for R. Graham, Vasquez is here for Ingram, Howard is here for Bryant, Houlihan is here for Jones and Cabrera is here for Hayes and Mr. Wu you're here for the government and so we're going to begin with Mr. Hagel. Good morning. My name is Stephen Hagel. I represent Antonio Glass. I will be discussing three issues this morning. The first issue is the trial court's exclusion of an essential defense witness for an unintentional violation of rule of sequestration. This violated the defendant's Sixth Amendment right to compulsory process and it deprived the defendant of his due process right to present a defense. The second issue has to do with the life sentence imposed on Mr. Glass on counts one and two. That sentence exceeded the statutory maximum of that statute. The third issue has to do with the RICO conspiracy. The failure of the verdict form in that count to require the jury to identify the two types of racketeering activities that they unanimously agreed upon resulted in an impermissible . . . You've got two minutes and so you've got several arguments there and so the first two that you say you want to Tracey Bryan as a witness. Tracey Bryan, Dr. Delacruz. Let's hear what you have to say about that. Okay. The witness Tracey Bryan was excluded for an unintentional violation of the sequestration rule. We know that it was unintentional because she did not even know that she was going to be a witness until a government witness . . . Was she on the witness list? She was not. Okay. Can I ask you a question about this? Let's just say I agree with you that that was error. Could you just play out for me how that was harmful error? And if so, there's so many defendants, who did it harm and how, I guess, would be the question I would ask. Okay. Ms. Tracey Bryan would have impeached an essential government witness named Vandell Coakley. Mr. Coakley tested . . . She would have impeached him as to this one part of his testimony, but his entire testimony affected every defendant to be a witness to the criminal acts of all of these defendants from the years 2001 to 2010. The two counts that my client was convicted on, which resulted in the life sentence, were both conspiracy counts. If the credibility of Mr. Coakley is damaged, his testimony at the conspiracy counts is also damaged and there's a great likelihood or some likelihood that the jury would not have believed his testimony at all. I'm sorry. I guess it depends on the level of impeachment, assuming that there's error. Correct. Right? So sometimes a witness gets impeached on something that's a little more trivial. Sometimes a witness gets impeached on something that's a little more serious and a little more material. So play out, to continue on Judge Brasher's question, play out why the impeachment on that issue would have undermined the rest of the testimony or why you think it would have. The issue that he would have been impeached on, the government witness would have been impeached on, is he said that he saw Mr. Glass running away from the scene of a murder. What Ms. Bryant would have testified about is that that was an absolute lie because she was present in her apartment with that government witness at the time, this is several years prior when they were together, and that the government witness, Mr. Coakley, was asleep at the time. She was awake, she heard the gunshots, she looked, she went there, she looked here, she looked there, and then after a while she woke up Mr. Coakley. Mr. Coakley was asleep during the time that he said he heard he saw my client running away from the murders. And as I said, Mr. Coakley testified as to many things, not just that murder. Mr. Coakley testified as to the criminal acts of all the defendants between the years 2001 and 2010. It is my contention that if his credibility is destroyed at that one part, the jury may very well have disbelieved all of his testimony. All right, got that argument, and you've reserved some time. Thank you. Thank you. Mr. Swartz for Walker. Good morning, Your Honor. May it please the court, my initial issue on behalf of the jury's discretion, by allowing the case agent and the police sergeant, who were both lay witnesses, to give their opinions to the jury that the defendant and his co-conspirators were affiliated with a gang known as the Bloods based on the evidence they reviewed. These conclusions were based on their knowledge, skill, training, and experience acquired outside the evidence, yet these two witnesses were not offered as qualified experts under Rule 702. Police sergeant Kelly was trained and experienced as a gang unit investigator and supervisor. She participated in gang task force sessions. She investigated multiple gangs, including the Bloods gang. Kelly concluded that the defendants were a Bloods gang and that the defendant, Walker, was part of the Blood gang. Case agent Perez . . . I think you have an argument, but the problem that I have with your argument in this case is that when you look at our prior cases, there's a line of cases that say officers can just do this in drug cases. Then there's another line of cases that say the officer can do it as both an expert and as a lay witness. If that's the case, then I don't know how we can say that the district judge abused his discretion. Your Honor, I think the case, the chief case that the government relies on is the Giussi case. The distinction there was that in the case agent's interpretations about the meanings of code words came from the case agent's examination of the documents and his investigation of the evidence in the case itself. What's distinguishing here is that both the case agent and Perez looked to outside experience, outside knowledge, outside skill and training to identify what they did was put together all of the various things that they identified and said, oh, based on our training and our knowledge, these are the Bloods gang. Different from the other line of cases, very similar to the Hawkins case where the agent was offered as an expert. Here they purposely avoid trying to qualify these two as experts when they should have been qualified as experts because they were relying on their knowledge, their training, their experience. They testified. Some testimony, even despite the case law that Judge Wilson mentioned, some things I would presume is admissible as lay testimony. For example, or maybe you disagree, but let me give you an example. Let's take Kelly, who you said had some experience with gang investigations and the like. Can that officer testify about gang tattoos? If she can, but in this case, she testified from her experience outside of this case. No, I understand the argument. I'm trying to figure out where the line is. If she's investigated a certain, let's say two or three gangs during her time and knows from her investigations, experience, interviews, etc., examination of people that a certain tattoo shows membership within a certain gang, can she testify to that even though it comes from outside of the courtroom? In that case, she should have been qualified as an expert. She should have been offered as an expert. Even though it is based in part on personal observation? At some point, her personal observation has to come from, or at least her signs in this year mean, have to come from training, have to come from her experience, and have to come from her overall skill set as a gang investigator, which she was in this case, which is why we're saying that raised the bar for her to be offered as an expert. She wasn't. They simply had her give her conclusions, but she admitted that she was a gang unit investigator and supervisor. She participated in gang task force sessions. She investigated multiple gangs, including the Bloods gang. So are you saying that lay witnesses can't give any opinion testimony at all? Is that what you're saying? Absolutely. I would certainly not go that far, Your Honor. I think that would be incorrect. I guess I'm having trouble figuring out. As Judge Wilson pointed out, we've got lots of precedents in this sort of general area, and how does one draw the line between, well, I'm a police officer, so I know coded language, for example, and I know things like that. Maybe not from this specific investigation, but from other investigations I've done, which I think you say is improper. Is that what you're saying? It's improper to offer this witness in the form of a lay witness to then give the conclusions and opinions that are really something an expert is qualified to give. And let me give an example. In this very case, the government offered an expert witness to testify about what this drug operation was about, to testify about the drug aspect of it. They qualified an expert, I think his name was Moya, an FBI agent. So in that case, they understood that they needed an expert and they offered an expert who was qualified for that purpose. That is what they should have done, or either Kelly or Perez, when being offered to give these opinions about pulling together all of these things that they saw on this case. This is indicia of the bloods. We got it. You preserved some time. Thank you, Your Honor. Mr. Fleischer for J. Bryant. Good morning, panel. May it please the Court, Bruce Fleischer on behalf of Jermaine Bryant. Bryant was sentenced to concurrent life sentences in this case, and I limit my argument to one issue, which is universal to all the defendants in the case, which is the Court's exclusion of the defense expert, Dr. De La Cruz. From the voir dire through the entire trial, the centerpiece of the government's case was that Bryant and his co-defendants were members of the Bloods gang who sold drugs in the city of Miami. This was the alleged conspiracy. This was the government's message and theme to the jury. In anticipation of this, the defense retained Dr. Jesse De La Cruz, who was actually a convicted felon, served 23 years in California State Prison, was a gang member of En el Oeste de la Familia, and when he got out of prison, he earned a B.A. in California, a master's degree and a Ph.D. in sociology and gang-related issues. He is a well-recognized expert and testified in state and federal court throughout the United States as far as gangs are concerned. He was given access to all the pertinent discovery in this case and reviewed all of that, and he was called in order to give an opinion that these defendants were not a Blood gang. The government made the Blood gang . . . . . . that there wasn't that gang or that these defendants were not affiliated or members with the gang? Both, Judge, that they were not Bloods, they were not a Blood gang. He went on to say in proffer testimony that they weren't a gang at all. I think his proffer was probably forty or fifty pages in the record. Explain. The district court said that it really wasn't an issue in the case that needed expert testimony because no one's arguing that they're responsible, for example, for drug sales in Baltimore or in Los Angeles or something like that because of being part of some national organization. What do you say about that? The theme of the government's case was these guys, these bad guys are the Bloods, they're a Bloods gang. It's our contention that these defendants were not a gang, they're not members of the gang, and they were just charged together because they all grew up in the projects, in the Gwen Cherry projects in Miami. This is for the purpose of establishing the enterprise element of the case. Dr. De La Cruz could not testify or would not be admissible that he could testify that they had no structure, they had no organization, they had no leader. I'm aware of the cases that the government has cited, but . . . We'll see what the government has to say about it and you've reserved some time. All right. You're over your time. Okay. We're trying to get through these cases this morning. We have not been excluded as a witness. Due process, fairness, fundamental fairness, and it doesn't matter whether or not it was lay testimony offered or expert testimony offered by these police officers, we should have had the ability, fundamental fairness, to call an expert, to deliver an opinion that these people were not a gang in Miami, they were not the Bloods. They might have sold drugs independently of each other, but they were not a blood gang. Understood. Thank you, Your Honor. Thank you, Mr. Flasher. Mr. Band, here for C. Bryant. Good morning, Your Honors. May it please the Court. My name is Michael Band. I represent Curtis Bryant. Mr. Bryant was sentenced to life imprisonment, life. I wish to address two categories raised in my brief. First, his trial court proffered no factual findings whatsoever and the lack of an evidentiary foundation for the introduction of a Facebook account for which the government, upon which the government built his case. Curtis Bryant's life sentence was based upon acquitted conduct and the amount of drugs attributed to him while he was in custody on unrelated charges. In Ramos, this court, that is the 11th Circuit, found in a case involving acquitted conduct, the court held the court's imposition of a two-degree murder sentencing guideline was appropriate because the trial court made, and I quote, a thorough and conscientious consideration of the evidence, the jury verdict, and the relevant law. In Gonzalez, a 7th Circuit opinion cited by the government in their brief, where again the trial court made factual findings as to witnesses' credibility, the consistent nature of those of that witnesses or those witnesses' testimony, and characterized the government's or the witnesses between gang members or civilians. Again, in this case, the matter before the court, no factual findings were made by the trial court. Why is  Dr. Ramos. Lack of factual findings about which particular matters, Mr. Band? Dr. Elmendorf. About, in this particular case, whether or not the defendant committed two acts of homicide. There is no factual findings by this court saying he did A, B, and C. Remember, the jury in count seven acquitted him of the use of a firearm where it is alleged there was a homicide, and never categorized, well, if it was a homicide, was it a first-degree murder? Was it a second-degree murder? Was it a manslaughter? Or, what could equally be argued? Was it a situation of defense of another? Dr. Ramos. What other factual findings do you think are missing that are  Dr. Elmendorf. The factual finding in Gonzales, Your Honor, where the court, I'm sorry, where the government cites the decision for a proposition that a defendant in custody can still be attributed to a certain drug amount, the trial court in that case found that that member was a member of that organization for 21 years, cited to his leadership role in the organization, his active participation in the sale of narcotics while out of custody, and indeed described him as a critical in terms of that organization. No findings like that were made. There was no individualized findings by the trial court as to, in this case, the amount of drugs he was responsible for when he was in custody. All right, thank you, Mr. Band. Thank you, Your Honor. Mr. Wu. Thank you. Good morning, Your Honors. Jason Wu on behalf of the United States. With me at counsel table is Ignacio Vasquez, who tried the case. These appellants were members of a violent street gang that controlled the drug trade in the Gwen Cherry housing complex, and a fair trial furnished overwhelming evidence of their drug and robbery activities. All of the claims that they challenged today in appeal either fell within the district court's discretion or rested on factual findings that were not clearly erroneous. Mr. Vasquez, I guess reaction from all the briefs. Again, it doesn't indicate what the ultimate right answer is, but it seems a little jarring to have officers testifying as lay witnesses about gang affiliation and membership in different respects. For the district court to exclude a defense expert who was going to testify about a lot of things, but certainly about gang affiliation and membership in existence. Sure. So that just seems jarring. And let me respond. Because if gang membership was undisputed, then nobody should have to testify about it. If it was an issue that was germane to the case and central to some of the charges, then both sides were able to present evidence within the courts. But the exclusion of one and the admission of another, tell me a little bit about that. Sure. So let me clarify our position. We're not saying that these defendants could never have had an expert on those subjects. We are saying that the particular expert they selected and the testimony that they proffered to the district court clearly infringed or verged into inadmissible territory. And here's why. This is the most central important fact about Mr. Delacruz. He did not simply testify and he did not give the opinion, these people are not a gang. The word he used throughout his testimony was enterprise, which is the legal term from the RICO statute. And here's why that's so problematic. So I think it's good to look at the Lankford case, which is the one that the defendants often cite. In Lankford, the proposition that the court stated was that a defense expert should be admitted on the same topic where the government got an expert. And the issue there was whether a certain amount of income should have been classified as earned income or as a gift. So of course, if the government has an expert to say that it's income, the defense has to have an expert to say that it's a gift. That's totally fair game. What would not be fair is if the defense expert came in and said, instead of trying to apply the IRS rules for what a gift is, that expert said, you know, in my experience, a gift usually comes in wrapping paper and it has a red bow on top and it's given around significant occasions like holidays, Christmas, birthdays, right? Like that person would be essentially redefining a legal term and then giving you an inadmissible, irrelevant opinion about me. The problem with your argument is that Dela Cruz wasn't disqualified as an expert. I mean, there was no Daubert analysis or anything of that nature. The judge just excluded it based on rule 401. So I think that goes to the same point, which is it's not relevant when an expert gives you a redefinition of a legal term and then tells you whether the facts meet their idiosyncratic view of the law. And so I think, you know, what's helpful maybe is actually let's go through all the components of Dela Cruz's testimony. If the lay witnesses for the government can testify as to the same thing, it just seems like it's significantly unfair to exclude Dela Cruz as a witness to operate in the same capacity that the government's lay witnesses are operating. And that's what I'm stressing is that the government's lay witnesses did not give the same nature of testimony. They said these people operate as an organization or gang. Dela Cruz was then brought in to say something very different because that's if you look at his entire proffer, what he starts with is he gives a definition of enterprise. How is it different now? Tell me again how it's different, because the government said in its closing argument, this is a gang because our witnesses said so. But Dela Cruz cannot say that this is not a gang based on my experience in identifying gang culture. The key that I'm trying to focus in on is the difference between saying people are a gang versus saying they are an enterprise, which is a RICO term of art. And Dela Cruz used the word enterprise, which is why in my supplemental authority letter I quote to you his final opinion. It's a page 108. What he says is this particular group does not meet one of the elements of a enterprise, in my opinion. That's the essence of what he was going to testify. What's that one element? The element would be the word enterprise in the RICO statute. And so what's troubling about that. But the language you just quoted said one of the elements of an enterprise. He was opining does not meet one of the elements. I think he meant does not meet any of the elements. That might have been his own imprecision. But his opinion, his opinions don't talk about gangs. They just talk about enterprise. The questions were consistently framed to him. What are the characteristics that you find in an enterprise? And then he responded to those questions. And then they asked him at the end, therefore, do you see these people as an enterprise? So the question, in fact. Is that how the district court explained its ruling? I think that is the way I understand the district court's ruling, because he said several times he said, you keep using the word enterprise. I don't know that anybody can have an expert on that. I think roughly speaking, that's how Judge Martinez described his ruling. And I think that's exactly what he was getting at, this idea that this expert was trying to redefine a legal term. And I think what's really important, let's contrast what Dela Cruz said about what are the characteristics of an enterprise versus Boyle, the Supreme Court's definition of that term, because Dela Cruz went 0 for 4. So he gave four characteristics. Number one, they have a leader. That's at page 90 of docket entry 1221. The Supreme Court in Boyle said there needs to be no hierarchical structure or chain of command. So that's 0 for 1. Dela Cruz then went on and said they have to have a bank or ledger and essentially collect money through dues. So the government's argument, as I understand it now, is if Dela Cruz had been offered to say, I know what a gang is and this isn't a gang and then use the word enterprise, then it would have been an abuse of discretion for the district judge to exclude him as a witness. Is that your argument? I think if they characterized and prepared him differently and asked him different questions and he gave a different opinion that was narrowly focused on the issue of gang, then yes, it probably would have been admissible testimony. I'm not saying it necessarily would have been an abuse of discretion to exclude it because it would have, you know, the district court may have given different reasoning. But at least in principle, they were entitled to an expert on this broad issue of whether they were a gang. They were not entitled to bring in an expert to try to give effectively a counter jury instruction, right? This would be like having one set of jury instructions from the district judge and then a totally different instruction from a purported expert redefining a legal term. And so on one of the issues that we're addressing here is the courts allowing the law enforcement agents to testify as lay witnesses using their experience and their expertise. What did the district judge mean when he said, I'm not a gatekeeper in this area any longer. I think the rules have changed. How have the rules changed? And is it true that a district judge is no longer a gatekeeper when it comes to the admission of this sort of testimony? So I have to admit that puzzled me a little bit, too. But I think we have to understand that in the context, these people were not proffered as experts. So I think his point was there's no such thing as a Daubert hearing for lay witnesses. I do think that's a true proposition. And what he meant, essentially, was that since it's only a lay opinion being offered, the jury decides what weight to give that opinion. He's not the gatekeeper to decide. You know, you don't decide the qualifications of a lay witness or whether they're using a methodology or anything like that. How have the rules changed? So the rule change that he might be referring to is that the lay witness rule did change around the early 2000s. That's the only thing I can divine from that. But again, the principle is sound, is that he did not need to perform anything akin to a Daubert inquiry for a lay opinion witness. District judge is still the gatekeeper, isn't he? In the sense that he decides the or she decides the admission of every piece of evidence, certainly. But I think gatekeeper is almost a special term that came from Daubert, referring to how you adjudicate the admissibility of expert testimony. So, again, I think the distinction that Judge Martinez was trying to draw was since these people are not experts, I don't do the Daubert gatekeeping inquiry laid out by the Supreme Court. About Tracy Bryant, who was excluded as a witness, she wasn't on the witness list. I mean. I guess what I don't understand is how is there a violation of the rule of sequestration if she was not on the witness list and she had every right to be in the courtroom anyway? So as we read the case law, I think it's a little broader than that. The case law essentially says that you can exclude a witness if there is an effort to intentionally shape her testimony. And that's what, in our view, the district court found in this case that Tracy Bryant heard, first of all, from an associate or family member of the defendants, what the subject matter of Vandal Coakley's testimony was. And then not only did she hear that and have an opportunity to decide how she was going to testify based on that, she even came into court the next day to hear the remainder of his testimony to ensure that he couldn't say anything that would. I thought the judge said that wasn't intentional on her part. No, Your Honor. So here's the whole sequence of events on day one. Mr. Hagel proffered this witness to explain the situation, and he laid out accurately the case law that said exclusion is restricted to intentional violations. The government never contested that case law. So everyone understood, district judge, parties, that exclusion was only possible for intentional violations. On day two, Tracy Bryant was brought in to proffer her testimony and speak about her decision to testify. And at that point, there was an extensive argument related to whether her conduct had been intentional. So in that context, the district judge made a commentary, a comment while engaging with the parties saying, oh, sure, if this was intentional, that would be an easy call. I'm trying to figure out whether it's intentional or not. Was it an intentional violation of the rule of sequestration or not? Our view is intentional within the meaning of the case law because it was an intentional effort to come into court and shape her testimony around what she heard from Mr. Hagel. But that can't be the rule because the rule says you have to not be in court, right? So the intentional violation is being a witness, but coming into court anyway to hear the testimony. If you're not a witness, how could you intentionally violate the rule by coming to court? And that goes to the point that Ms. Bryant came in even after essentially hearing Vandal Coakley's testimony secondhand, realizing she had witness testimony to give, countering that, or at least that she was going to create witness testimony that would counter that. And then she still decided to come into court the next day. That's the intentional, critical, intentional step to be able to shape her testimony to specifically. Our case law, though, says that there's a better way to handle that than to just exclude the testimony of a very important witness at the trial, and that would be to permit the government to cross-examine her about the fact that she heard this testimony while she's in there or cite her for contempt. But doesn't this significantly prejudice the defendants in the case by excluding the testimony of a very important witness? It did not, Your Honor. So let me move on to the next argument, which is that this exclusion would be harmless in any event. And here's why. I think we started telling the story. But could the court have cured it in a different way other than just you can't testify? Sure. It rested within the court's discretion to, as you say, permit cross-examination on the issue. I don't dispute that the court could have done that. But here's why the decision was harmless in any event. The critical aspect, as Judge Jordan was asking and Judge Brasher were asking, that Tracy Bryant was trying to impeach was that Vandal Coakley was an eyewitness to Antonio Glass killing a man named Pooh Johnson. But there was overwhelming evidence on this score entirely independent of Mr. Coakley's testimony, which was cumulative on that front. So the two witnesses that I would ask the court to look at are Letitia Houser and Larry Grimes, two other important cooperating witnesses. Ms. Houser, the names again, please, Mr. Oh, sure. Letitia Houser. And I'll give the record citations. But her testimony is at Docket Entry 1213, pages 19 to 22. And then Larry Grimes, his testimony, the important testimony is at Docket Entry 1205, pages 28 to 30. What Houser had to say, she saw the gun battle, too. So the same fight that eventually led to Johnson's killing, she did not see Johnson shot directly because of her vantage point, but she saw a gun battle where Antonio Glass is shooting. She sees Antonio Glass run away. And then after he runs away with a gun in his hand, she sees him come back without the gun. And then the next day, Houser's partner, Quincy Bryant, another member of this group, asked Glass what he had done with the gun. He replied he threw it over the bridge. The next day, Ms. Houser overhears another conversation between Quincy Bryant and Antonio Glass, in which Antonio Glass is asked, why did you shoot Pooh Johnson? Why didn't you just let us fight him, kind of beat him up to punish him? And Glass replied, F that N word. So he defiantly basically admitted to the killing. Not only that, we had in Larry Grimes' testimony, we completed the picture both before and after. We got the motive of the murder and another confession from Glass to a different group of people. So what Larry Grimes testified to is that before this altercation happened, Jermaine Bryant and Glass had a conversation about how this Johnson person had stolen drugs and a gun from the group. Jermaine Bryant tells Glass, you can't be letting anybody do your projects like that. You already know what you've got to do. So Grimes gives us the motive and the reason why the murder happened. Then in the ensuing days after the murder, a group of them start making fun of Glass because he's a relatively young member. And they sort of tease him about the fact that this was his first body, meaning his first murder. And Glass replied to them, that ain't my first time killing nobody. That's the pages 29 to 30 that I mentioned of documentary. Can I ask you a question? So I think that's a really good harmless error analysis. But what the defendants are arguing is a little bit different. They're arguing that the harmfulness comes from the inability to impeach this witness who not only testified about the murder, but testified about all sorts of other stuff. And so they're saying, look, let's say that the murder happened, but this witness was a cooperating witness. He had some incentive to sort of, you know, build up his own importance and testify about things that he didn't really know about. And we have this witness who comes in and says, I know he didn't know about that. I know he lied there because I was with him when that happened. Isn't isn't that sort of what do you say about that kind of broader argument for prejudicial error? So I'd say, first of all, it's obviously a more tenuous type of impeachment, right? It's not the thing that he was directly impeached on. It would depend on an inference that somehow he's making up his entire life story, the last 20 years of conduct that he engaged in and that he pled guilty to. So I think it's implausible on its face. But even granting that, even if we took Coakley's entire testimony out of the case, this was a massive trial. There were four cooperators aside from Coakley who testified to important parts of the gang conduct. And so even if you ignore Coakley, I would say you can read Larry Grimes testimony. He was an insider, a member of the gang for several years. And he implicated many of these people. Any of the people that Mr. Grimes did not cover were then covered in the testimony of Letitia Houser, who was the group's drug supplier between 2015 and 2016. And she implicated kind of the later end of the timeline of who was involved in the late mid 2010s, as well as Donzel Jones, who was another person in the projects who sold drugs and knew the members of the group and heard them talking about their gang activities. Again, similar time frame on the later end with Ms. Houser. So without Coakley, we already had those three cooperators. Aside from that, there were over 40 police officers who testified in this case to various controlled drug buys, robberies and violent crimes that this group committed and that they investigated. And then beyond that, there was surveillance footage of multiple interactions, including drug buys, two of the murders, robberies. And finally, of course, the overwhelming social media evidence of the group openly proclaiming in many instances their membership in DSBF or whatever synonyms they used for the group. So given that, all that evidence, it's overwhelming, regardless of whether you consider Vandal Coakley at all. I hate to inject another issue into this already complicated oral argument, but one of the things that we did not talk about with defense counsel that bothers me is about Daniel Jones's enhancement for directing violence. So he was enhanced for directing violence. And the way I understand this, correct me if I'm wrong, is that there was a robbery of someone who had drugs and then those drugs ended up being sold by Jones. Is that right? Yes. Yes, you have that right. How is that how is that sufficient evidence to apply an enhancement that says that Jones directed the violence? I think we seek it from an inference that the person who obtains or reaps all the benefits of a crime must be the one who ordered it or directed it. So in this case, Antonio Glass, Sam Hayes, rob a man named Antoine Roll, who is the final cooperating witness. He testified to the robbery of his marijuana. And then we have video where they return to the Gwencherries and they give the jar or give something to Jones. And it turns out through Facebook evidence and other sources, it later and through witness testimony, it's shown that Jones was the one who received the marijuana and got to sell it. So it would be exceedingly odd, I think, if the people who perpetrated the crime just gave away its proceeds for no reason to a person who had not directed them, was not aware of their actions, did not plan that. And maybe this doesn't matter. I mean, but but why would that be odd? Because they're in a gang, right? So, I mean, if the if some people in the gang go and get marijuana to sell, whether they get it through robbery or purchases or whatever, you would sort of expect them to give it to somebody else to sell there in a gang. I don't understand that inference. So first of all, let me maybe back up and stress this is also clear error finding of the district court, right? I think an implicit finding that we can draw from the sentencing transcript. So in that sense, it's not about whether you entirely agree with the inference, but just whether you think that's a plausible inference and there is sufficient record support for it. So looking at it from that perspective, I agree. That's not an ironclad or bulletproof inference that you could draw from those facts. But generally speaking, if I saw someone beat a person up, take their cell phone on the street and then immediately bring it to someone else and hand them the cell phone, I think it's reasonable to suspect that the one who got the cell phone must have been the one directing the action. All right. Thank you, Mr. Wu. Thank you. Mr. Egle, you reserve some time. Yes. Pardon me. Yes, Your Honor. Thank you. I'd like to address the harmless error aspect of Miss Tracy Bryant's exclusion. First, there is no doubt that this was unintentional. The government's characterization that she went back and heard something and then intentionally went back to court after she had heard a witness testify, nothing that she heard firsthand had anything to do with what her testimony was. Her testimony was, did Vandell Coakley, was he able to witness what he said he was able to witness? As to the harmless error part of it, let me read briefly from Braswell versus Wainwright, which says that the jury might have still have returned a guilty verdict is besides the point. Judgment of the credibility of a witness is for the trier of fact. The trial court arbitrarily excluded Rogers, the witness upon no other basis than that he violated the rule. Such discussion discretion cannot be permitted when it denies the defendant a fundamental constitutional right. I think Mr. Glass was denied a fundamental constitutional right of confronting witnesses and presenting his own case. Thank you, Mr. Egle. Mr. Swartz. I wanted to briefly address the point that the court made and I think the court hit it right on the head. If the district court allowed these two lay witnesses to testify about what we argue was expert conclusions, they were not allowed, the defense was not allowed to offer its proffered witness on that very area. But the court, I think, hit it right on the head that the court did make a comment about it not being the gatekeeper, but in fact, the court was incorrect in that finding and I think that goes to the heart of its decision in allowing these lay witnesses to testify as expert witnesses. The line blurred and it blurred to the point where it became harmful for the defense in presenting its defense by then offering an expert witness. The line blurred because the court should have been the gatekeeper and excluded witnesses that were clearly offering expert testimony on very important matters of the game. Thank you, Your Honor. Thank you, Mr. Swartz. Mr. Boucher. Mr. Fleischer, Mr. Wu says that your expert, the defense expert, Mr. de la Cruz, was couching his opinions in terms of legal verbiage and legal conclusion. Instead of talking about gang membership affiliation existence, he was talking about whether or not there was a quote unquote enterprise and that sort of crossed the line. Can you address that? Yes, Judge. In the event that there was a proper Dalbert hearing, we believe that we could have modified Dr. de la Cruz's testimony to limit it just to the actual gang issue, the blood issue, and he would not have to have gone into an enterprise, the structure, the rules . . . Did you ask the court if he could do that? I'm sorry, Your Honor.  We made a proffer. Did you ask the judge if you could ask the expert to give us his views about gang culture and stay away from the word enterprise? It most respectfully didn't seem that the district court wanted to hear anything further from us on that issue. I know the government raised that issue in one of the supplementary cases that they had given us, but I think we were just cut off by the district court in doing this. What do you say about the . . . I mean, this is some language from the expert. He said, two things are very important in a criminal enterprise, a prohibition on drug use and a formal vote to agree on killing another gang member. Where does this stuff . . . how would an expert be able to say, like, these are the things that make up a criminal enterprise as a matter of law? I think he was talking about the gang in general and perhaps the enterprise. He's saying from his own experience that a gang doesn't operate the way that these defendants did. I think that his testimony was in the proffer that these are just a bunch of yahoos who are doing these things, and they're doing these things not as a group, not as a gang, not as an organization. They're doing it all on their own. They just happened to be in the Gwen Cherry projects when this happened. So I think what the government is saying is there's no problem with him. There may have been no problem with that sort of testimony, but he can't say this isn't what they were doing. This wasn't an enterprise within the meaning of the RICO statute. They weren't the Bloods, and they weren't a gang. And if I can just interject, the testimony . . . I guess, how can I ask? I mean, I'm sorry. I hate to cut you off earlier, but the they weren't a gang thing just seems so odd to me when they have a name for their gang. They're the social media post where they refer to each other in light of the gang. It just seems so odd to argue that they're not a gang. But even if they did that, according to our expert, they really were not a gang. They shared some common interests about that, but they just acted independently of one another. And one of the things I wanted to interject was that Romain Bryant had not lived in that area, had not done anything in that area since his release from prison in 2011. He had been separate and apart from them. So even if he was selling drugs, he was not part of the Blood Gang. Thank you. Thank you for your time, Your Honor. Mr. Band? I may briefly address the issue brought forward by Mr. Wu. The overwhelming social media provided evidence in regard to Curtis Bryant. There was no connection ever made that the Facebook account attributed to him was his, every other defendant. They connected a Facebook account with a phone number and email address. In this case involving Mr. Bryant, the only connection was the agent said so it must be him. And if you recall from the evidence, there were two Facebook accounts attributed to him. We were able to locate one of the owners of the Facebook account who said unequivocally, that's not Curtis's, that's my Facebook account. And when I called the agent back, the agent very secretly said, well, I was mistaken, it's not his. So this evidentiary, this lack of a foundation connecting my client to a Facebook account fails the government's foundational test. And this court in looking at it, when we were young lawyers, if you wanted to introduce a photograph, there were steps, there were three or four questions asked to authenticate a photograph, to tie a photograph into a given individual or a statement or something like that. In this particular case, nothing tied my client to the Facebook account. And again, in regard to the acquitted conduct, no factual finding whatsoever where this court can make a decision that the district court judge found that these facts would be a preponderance of the evidence. Indeed, I suggest there was no evidence. Thank you, Mr. Bann. Thank you, Your Honor. And the court would like to thank all of you, all of the counsel for accepting the appointment to represent the defendants in this case. We appreciate your service. Thank you very much.